# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE DIVISION

| | | |
|---|---|---|
| **VANICE D. GUIDRY** | * | **CIVIL ACTION NO. 10-1605** |
| **VERSUS** | * | **JUDGE MELANÇON** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

    This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Vanice D. Guidry, born November 19, 1956, filed applications for a period of disability, disability insurance benefits and supplemental security income on October 7, 2008, alleging disability as of September 20, 2008, due to cardiovascular disease, coronary artery disease, status-post coronary artery bypass graft x 2, hypertension, hyperlipidemia, and dysthymic disorder.

## FINDINGS AND CONCLUSIONS

    After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's finding that the claimant

was not disabled.  However, I recommend that this matter be remanded for further administrative action, based for the following reasons:

**(1) Records from Cardiovascular Institute of the South ("CIS") dated October 4, 2006 to July 13, 2007**.  On June 27, 2007, claimant complained of shortness of breath for the previous month.  (Tr. 136).  He had a history of coronary artery disease, status-post coronary artery bypass graft, dyslipidemia, hypertension, and CVD.  (Tr. 137).

A myocardial perfusion report (with exercise stress testing) dated July 13, 2007, was normal.  (Tr. 139-41).  The left ventricle was normal-sized with an ejection fraction of 51%.  Wall motion demonstrated mild global hypokinesis.  Transthoracic echocardiography revealed trace pulmonic and tricuspid regurgitation.  (Tr. 142-43).

**(2) Consultative Examination by Dr. Kenneth A. Ritter dated January 19, 2009**.  Claimant complained of having heart disease, left upper anterior chest pain with straining or sometimes standing, nervousness, and hypertension.  (Tr. 150).  His medications included Lisinopril and Aspirin.  He had run out of his other medications.

On examination, claimant's blood pressure was 158/94.  (Tr. 151).  He was 5 feet 5 ½ inches tall and weighed 181 pounds.  His heart had sinus rhythm

without murmur or gallop.

As to the extremities, claimant had a normal gait and station. He had a full range of motion of all extremities, and negative straight-leg raises. Neurologically, he was intact with normal DTRs, strength, and sensation.

Dr. Ritter's impression was coronary artery disease, with no symptoms of chest pains or dyspnea since his last clinic visit in October, 2008; hypertension, with elevated blood pressure during examination, and chronic non-compliance with his medical regimen. (Tr. 152).

In the Medical Assessment of Ability to do Work-Related Activities (Physical), Dr. Ritter determined that claimant could lift/carry 15 to 25 pounds occasionally and 10-25 frequently. (Tr. 153). His ability to stand/walk and sit were not affected by his impairment. He was able to perform all postural activities frequently.

**(3) Psychological Report from Alfred E. Buxton, Ph.D., dated March 5, 2009**. Claimant reported restless sleep with good appetite. (Tr. 161). Socially, he tended to be to himself. He was able to cook, shop, manage money, travel, communicate, and manage time independently. He helped out with some minor household chores and duties.

On examination, claimant's verbal receptive and expressive language skills, dress and groom, and social skills were good. Recent and remote memories were intact. His ability to attend and concentrate was good. Pace was even. Intellect appeared to be within normal limits.

Judgment and reflective cognition were good. Reasoning and insight were fair. Cognitions were clear and cogent. Mood was of mild anxiety with associated mild dysphoria.

Claimant noted passive suicidal ideation. His self-image was a bit poor. Goal orientation was positive.

Claimant was a chronic worrier. He was easily upset, then tended to fuss, which was a chronic problem that pre-dated his heart problems. He had occasional reflective dysphoria with associated crying spells secondary to his life situation. He had occasional happiness. He was alert, responsive, and oriented in all four spheres.

Clinically, claimant presented with dysthymic disorder, with degree of impairment mild to moderate and prognosis fair, and intermittent explosive disorder, chronic, with degree of impairment mild to moderate and prognosis fair. (Tr. 162). Dr. Buxton recommended outpatient mental health intervention and

psychoactive medication counseling to deal with the dysthymia and intermittent explosive disorder.

Claimant's Global Assessment of Functioning score was 60 to 65 over the past 12 months. He was bright enough to understand simple as well as some complex instruction and command. Dr. Buxton determined that, within the restrictions placed on him by his cardiologist, claimant should be able to perform, at a minimally adequate level, in a reliable and dependable fashion as an employee, and be able to tolerate the frustration and stress he would encounter in the job setting. Additionally, with adequate motivation, he would be able to establish and maintain mutually rewarding relationships with co-workers and supervisors.

**(4) Psychiatric Review Technique ("PRT") dated March 14, 2009**. Lawrence Guidry, Ph.D., assessed claimant for dysthymic disorder and intermittent explosive disorder. (Tr. 165, 168, 172). He found that claimant had mild restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, and pace. (Tr. 175). He had no episodes of decompensation.

**(5) Residual Functional Capacity ("RFC") Assessment dated March 17, 2009**. Dr. Mark M. Walker determined that claimant could lift/carry 20 pounds

occasionally and 10 pounds frequently.  (Tr. 182).  He could stand/walk and sit about six hours in an eight-hour workday.  He had unlimited push/pull ability.  He could perform all postural activities occasionally, except that he could never climb ladders/ropes/scaffolds.  (Tr. 183).

**(6) Records from University Medical Center ("UMC") dated March 30, 2009 to October 5, 2009**.  On March 30, 2009, claimant complained of shortness of breath at night while lying down.  (Tr. 195).  EKG and chest x-rays were normal.  (Tr. 199-202).  The assessment was CAD, HCVD, and tobacco abuse.  (Tr. 197).  He was prescribed Lopressor, ASA, and Nitro spray as needed.  (Tr. 196).

On June 26, 2009, claimant complained that his chest pain was worse.  (Tr. 192, 194).  He smoked four cigarettes per day.  (Tr. 193).  He was instructed to quit smoking, and his medications were adjusted.

A carotid ultrasound dated October 5, 2009, showed no hemodynamically significant stenosis.  (Tr. 220).  A non-contrast CT of the head revealed no acute findings.  (Tr. 221).

**(7) Records from Iberia Comprehensive Community Health dated July 9, 2009 to September 28, 2009**.  On July 9, 2009, claimant complained of hypertension, severe mood swings, and problems with anger management.  (Tr.

6

214). On examination, his blood pressure was 124/82. (Tr. 215). His heart rate had regular rate and rhythm.

The assessment was coronary artery disease, benign essential hypertension, hyperlipidemia, continuous nicotine dependence, and depression with anxiety.

On August 24, 2009, claimant complained of dyspnea with exertion and "dizzy episodes" occurring three times a month for three months. (Tr. 211). He also reported that he had not been taking his Lipitor due to costs "in a long time."

The diagnosis was multiple syncopal episodes. (Tr. 213). It was noted that claimant had stopped going to CIS due to lack of health insurance, and refused to go to UMC because he had already gone and "nothing was done."

On September 28, 2009, claimant reported that his blood pressure was high, and he was having chest pains. (Tr. 208). He also reported that he was passing out more frequently. The assessment was fainting with unconsciousness lasting about one to five minutes. (Tr. 209).

**(8) Records from Dauterive Hospital and CIS dated September 14-15, 2009**. Claimant presented to the emergency room with left-sided chest pain and left arm numbness. (Tr. 222). Chest x-rays showed no acute cardiopulmonary abnormality. (Tr. 228). An echocardiogram showed sinus rhythm, no left ventricular hypertrophy, normal overall left ventricular systolic function with an

estimated left ventricular ejection fraction of 50%, normal excursion of valve leaflets, aortic sclerosis without stenosis, and normal pulmonary artery pressure. (Tr. 225-26).

**(9) Records from Dr. Robert Lahasky dated April 6, 2009 to May 13, 2009**. Claimant complained of pain in his left side for two weeks. (Tr. 241). He also reported that he had passed out once, and almost passed out another three times. He was prescribed Mobic, Chantix, Levitra, and Nitroglycerin.

**(10) Claimant's Administrative Hearing Testimony**. At the hearing on November 16, 2009, claimant was 52 years old. (Tr. 24). He was 5 feet 4 ½ inches tall and weighed 187 pounds. (Tr. 25). He had attended school through the ninth grade. He had taken a Vo-Tech course in welding, and completed one in cooking. (Tr. 26).

Claimant testified that he had last worked in September, 2008, as a truck driver. He stated that he had driven 18-wheelers for the prior 15 years. (Tr. 27). He reported that he had stopped working because of breathing problems and chest pain. (Tr. 28).

Regarding complaints, claimant testified that he was still having fainting spells. He also reported left arm numbness, shortness of breath, and chest pain. (Tr. 29). He stated that he took nitroglycerin, which relieved the pain. He said

that his other medications helped, and he had never had side effects from them. (Tr. 32).

As to activities, claimant reported that he took care of his dogs. (Tr. 29). He went shopping with his wife occasionally, but had to sit in the car sometimes. He stated that walking wore him out.

Claimant said that he had difficulty finishing chores because he became out of breath. (Tr. 30). He stated that he watched television a lot, attended church every Sunday with his wife, and also wrote poetry.

Claimant had a driver's license, but drove only occasionally because he was afraid of fainting while driving. He had tried swimming, but had trouble breathing. (Tr. 35).

Regarding restrictions, claimant testified that he had tried walking a street block, but had a problem with breathing. (Tr. 32). He said that he could stand for 15 minutes, then had to sit down. (Tr. 33). He could lift about 30 pounds.

Claimant reported that he had problems getting along with other people because of his bad attitude. He stated that his main problems were his breathing and heart issues. (Tr. 34).

**(11) Administrative Hearing Testimony of Harris N. Rowzie, Vocational Expert ("VE")**. Mr. Rowzie classified claimant's past work as a

tractor-trailer driver as medium with an SVP of 4.  (Tr. 38).  The ALJ posed a hypothetical in which he asked the VE to assume a claimant of the same age, education, and vocational experience; who was limited to light work; restricted to working indoors in an air-conditioned environment, and could have no more than occasional contact with the public.  In response, Mr. Rowzie testified that claimant could not do any of his past work, but could work as a food preparation worker, of which there were 147,000 nationally and 4,000 statewide; dishwasher, of which there were 184,000 nationally and 2,200 statewide, and hand packer and packager, of which there were 442,000 nationally and 2,500 statewide.  (Tr. 38-39).  When the ALJ asked whether any jobs would be available if claimant had to miss work at least three days a month, the VE responded, "No."  (Tr. 39).

  **(12) The ALJ's Findings**.  Claimant argues that: (1) the Appeals Council erred in failing to properly consider all of the relevant medical evidence submitted by claimant; (2) the Commissioner failed to properly apply the slight abnormality standard and erroneously found that his mental impairments were not severe; (3) the Commissioner's assessment of his RFC was not supported by substantial evidence; (4) the Commissioner's credibility determination violates SSR 96-7p, and (5) the Commissioner erred in not finding him disabled pursuant to Medical Vocational Rule 201.10.  Because I find that the Commissioner erred in failing to

consider claimant's additional medical records, I recommend that this case be **REMANDED** for further proceedings.

As to the first argument, claimant submitted new evidence to the Appeals Council consisting of records for the period December, 2009 to April, 2010, relating to his heart condition. [rec. doc. 11, pp. 6-7]. These records show that claimant continued to have chest pain, shortness of breath, and syncope, and was diagnosed with unstable angina and reversible ischemia. [rec. 11, Exhibit B].

When new evidence becomes available after the Secretary's decision and there is a reasonable possibility that the new evidence would change the outcome of the decision, a remand is appropriate so that this new evidence can be considered. *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995). In order to justify a remand, the evidence must be (1) new, (2) material, and (3) good cause must be shown for the failure to incorporate the evidence into the record in a prior proceeding. *Leggett v. Chater*, 67 F.3d 558, 567 (5th Cir. 1995).

Reviewing the materiality of the new evidence requires the court to make two separate inquiries: (1) whether the evidence relates to the time period for which the disability benefits were denied, and (2) whether there is a reasonable probability that this new evidence would change the outcome of the Secretary's decision. *Ripley*, 67 F.3d at 555.

In this case, the Commissioner acknowledges that the new evidence relates to the time period at issue.  However, he argues that claimant failed to show good cause for timely producing these records because "there appears to be no indication in the record that Plaintiff ever sent the evidence to the Appeals Council or that the Appeals Council ever received such evidence."  [rec. doc. 12, p. 2]. This statement is erroneous.

While the Commissioner asserts that he had never received these new records, the Request for Review of Hearing Decision dated May 24, 2010, shows that claimant had attached additional medical records for review by the Appeals Council.  (Tr. 4).  Additionally, claimant's brief filed with the Appeals Council specifically refers to these updated records, and requests that the Appeals Council consider them in conjunction with the medical evidence already in the file.  (Tr. 133).  Further, in his reply memorandum filed with this Court, claimant attached a copy of a U.S. P.S. Express Mail shipping receipt indicating that the brief and documents were received by the Appeals Council on May 25, 2010.  [rec. doc. 15, Exhibit 1].

The Social Security Regulations provide that "[i]n deciding whether [claimant is] disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."  20 C.F.R.

§ 404.1527. Here, the evidence submitted to the Appeals Council is relevant to the time period of issue. The new records also indicate that claimant continued to have symptoms for which he was seeking treatment. These could affect the determination as to his residual functional capacity.

Accordingly, the undersigned recommends that this case be **REMANDED** to the Commissioner for further administrative action pursuant to the sixth sentence of 42 U.S.C. § 405(g). This includes, but does not limit, sending the case to the hearing level with instructions to the Administrative Law Judge to reassess claimant's condition based on the new and material evidence.[1]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

---

[1] The records reflect that claimant had been non-compliant with his medications on occasion. It is well established that failure to follow prescribed medical treatment precludes an award of benefits. 20 C.F.R. § 416.930(a), (b); *Johnson v. Sullivan*, 894 F.2d 683, 685, n. 4 (5th Cir. 1990). On remand, the ALJ should assess this issue as well.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed February 17, 2012, at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

14